## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LA'PORCHIA STAFFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00402** |
| | ) | **Judge Aleta A. Trauger** |
| **WB FROZEN, US, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment (Doc. No. 32) filed on behalf of defendant WB Frozen, US, LLC ("WB"), seeking dismissal of the employment discrimination and retaliation claims in the Complaint (Doc. No. 1) filed by plaintiff La'Porchia Stafford. For the reasons set forth herein, the motion will be granted in its entirety.

## I.     RULE 56 STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In moving for or responding to a motion for summary judgment, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support

or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume the truth of the nonmoving party's evidence and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence" that the nonmoving party is entitled to a verdict. *Id.*

## II.     FACTS AND PROCEDURAL HISTORY[1]

### A.     The Parties

Defendant WB is a manufacturer and seller of bakery products for in-store and food service bakeries. At all times relevant to this lawsuit, it operated a commercial bakery (the "Bakery") in Lebanon, Tennessee, engaged in manufacturing donuts.

Plaintiff La'Porchia Stafford, a Black woman, is a former employee of WB and resided in Nashville, Tennessee at all relevant times. (Doc. No. 11, Answer ¶ 4.) She was employed by WB for several months in 2017. Her claims in this case, however, arise from her employment by WB at the Bakery from February 1, 2022 through her termination on April 26, 2022. (*Id.* ¶ 5.)

### B.     The Bakery's Production Line Operations

The Bakery divided operations among departments, including Production, Quality Assurance, Sanitation, Warehouse, Maintenance, and Engineering. During the plaintiff's employment, the Bakery's Production Department operated five donut "production lines" and ran four different shifts, A, B, C, and D. The A and C shifts were both day shifts that operated on alternate days, and B and D were night shifts operating on alternate days. Each shift had one Line Lead for each production line and two Shift Leaders.

Employees working on the production line were referred to as Production Associates. Each production line had various positions, including mixer, fryer operator, breaker, line operator, and packaging. According to the Production Associate Job Description, "[a]fter thorough training, employee[s] must be able to operate assigned equipment. Cross-training in various areas is encouraged." (Doc. No. 33-8 at 2.) Production Associates were expected to "[p]articipate in

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Facts (Doc. No. 39) and are undisputed for purposes of the Motion for Summary Judgment.

training opportunities." (Doc. No. 33-8 at 2.)

Although Production Associates were generally trained on one position on the line and assigned to a specific position for each shift, some were trained on more than one position ("cross-trained"), and, even if not actually cross-trained, they were often asked to move around to different positions on the line and to assist other team members as needed. (*See* Steelman Dep. 29–30, 76–78; Newsome Dep. 66.)[2] It is undisputed that Production Associates could be assigned to different lines depending on the shift and the Bakery's business needs.

Production Associates reported to Line Leads. Line Leads were responsible for ensuring that Production Associates were performing their duties correctly, equipment was running properly, and providing support for the line. (Demps Dep. 20, 28; Steelman Dep. 20–21.)

Each Line Lead was responsible for a specific line on their shift. However, Line Leads sometimes covered a different line or oversaw more than one line at a time if there was a staffing shortage. Line Leads had authority to assign Production Associates to various positions on the line and determine which line they would be assigned to for each shift, and they had the ability to write up Production Associates for attendance and conduct issues. (Demps 21–22; Allen 11–12.) However, Line Leads could not make hiring, firing, or disciplinary decisions (Demps Dep. 20–22; Allen Dep. 12, 17) or assign a Production Associate to another position (Newsome Dep. 28).

Line Leads reported to Shift Managers. Shift Managers were responsible for ensuring smooth operations of the shift and solving routine issues, such as mechanical failures and employee disputes. Shift Managers could discipline employees and make line and position assignments but could not hire, promote, or terminate employees on their own. Shift Leaders reported to the

---

[2] For reasons unclear to the court, the parties have filed multiple copies of most of the relevant deposition transcripts. The court refers herein to the depositions only by their original transcript pagination.

Production Manager Leader who reported to the Bakery Manager.

At the time the plaintiff was employed, Tyrone Debow was A shift Line Lead on line 5, and the plaintiff's mother, Sherry Clemmons, was A shift Line Lead on line 4. (Allen Dep. 26; (Stafford Dep. 122.) Heather Demps was Line Lead on C shift. (Demps Dep. 13.)

Christina Allen was a Shift Manager (or Shift Leader) on A shift. (Allen Dep. 8–9, 24.) Allen was aware that Stafford was Sherry Clemmons' daughter. (Allen Dep. 23–24.) Thomas Steelman was a Shift Manager of C shift. (Steelman Dep. 8.)

During the plaintiff's employment, Devon Ripley was promoted from Shift Manager of C shift to the position of Production Manager. (Ripley Dep. 8.) Dorcas Wah-Abel was HR manager. (Wah-Abel Dep. 9–10.) Robert Newsome was Bakery Manager (or "site leader"). (Newsome Dep. 9–10.)

### C.    WB Policies

#### 1.    Code of Conduct

At the time of the plaintiff's employment, WB had an Employee Handbook. (Doc. No. 33-12.) Under the heading "Employee Responsibilities," the Handbook states that "all employees are expected to use good judgment and take responsibility for their conduct." (*Id.* at 35.) The policy stated that team members were expected to "[s]upport the performance of your team and work to help your fellow employees" and to "[t]reat every [WB] employee with dignity and respect." (*Id.*) The Handbook also articulated WB's policy regarding serious misconduct, which prohibited "[t]hreatening or fighting on company premises or during conduct of business away from the plant," "[i]nsubordination, such as refusing to perform a work assignment, or refusing to follow direction of appropriate [WB] personnel, the use of abusive or threatening language toward such individuals, or any conduct that undermines supervisory authority." (*Id.* at 38.) At the time of the plaintiff's employment, all positions from Line Lead through the Site Leader had the ability to

recommend disciplinary action for Production Associates who violated WB's Code of Conduct or other policies.

### 2. *Performance Improvement Program and Observation Period*

The Handbook describes WB's progressive discipline policy, or "Performance Improvement Program," which contemplates a progression of corrective action steps based on the number of performance or conduct issues. (*See* Doc. No. 33-12 at 37.) The first disciplinary step is typically oral counseling; the steps proceed through written reminders, unpaid suspension, final written warnings, and termination. (*Id.* at 37–38.) However, although the steps of the corrective action are identified as "progressive," WB expressly "reserve[d] the right to assign any step of corrective action based on the seriousness of the act." (*Id.* at 37.) In addition, the Performance Improvement Program does not typically apply to probationary employees. (Newsome Dep. 85–86.)

WB used a 90-day probationary period, or "observation period," to evaluate new employees' performance and fit, specifically their attendance, work conduct, and performance and whether they were a "team player." (Doc. No. 33-12 at 14; Wah-Abel Dep. 56–57; *see also* Doc. No. 33-1, Roach Aff. ¶¶ 7–8.) During the observation period, the employee's "[s]trengths and weaknesses will be discussed and helpful feedback regarding [her] development and progress will be given." (Doc. No. 33-12 at 14.)

Typically, employees are given both verbal and written feedback during the observation period, though the policy does not require written feedback. (*See id.*; *see also* Wah-Abel Dep. 59 (explaining that, when there are issues with a new employee's performance, the "shift manager would likely sit them down and have a conversation with them").) Preferably, these counseling sessions should be documented, particularly if an employee has already been counseled but has not improved, but they are not always documented. (Wah-Abel Dep. 60–61.) Production Manager

Devon Ripley explained that he believed the company had, during the relevant time, a practice of having 30-day, 60-day, and then 90-day meetings with probationary employees to discuss how they were doing, and he believed these meetings were typically documented in writing. (Ripley Dep. 27–28.)

### 3. Conflict of Interest Policy

WB also had a Conflict of Interest Policy in effect during the plaintiff's employment, which stated, in relevant part:

> [WB's] policy is to hire, promote, and transfer employees on the basis of individual merit. To avoid any hint of favoritism or discrimination in making such decisions, the employment of relatives at certain levels of the company, especially in positions where one might have influence over another, is regarded as a potential violation of this policy.

> Applicants shall not be employed on a continuing basis or be transferred to departments where a relative is already employed. . . .

> If two employees become related after they are hired by [WB], they are expected to notify the Human Resources Department immediately. A transfer or change of supervisory assignment may be necessary if: (1) both employees work in the same department, (2) if one supervises the other, (3) if one or both have access to confidential information, or (4) if one might influence employment or personnel decisions affecting the other.

> As long as no disruption is created and the relationship between related employees is harmonious in our business environment, employment of family members is accepted within our team concept.

(Doc. No. 33-12 at 18.)

In practice, it appears that the Conflict of Interest Policy was not strictly enforced. Rather, it was generally understood to mean that no employee should be in a position of reporting to a family member on the same shift. (*See, e.g.*, Nimmo Dep. 35; Newsome Dep. 75–76.) The purpose of this policy was to promote workplace safety and avoid favoritism—or the appearance of favoritism—by, for example, avoiding a situation in which one relative was required to report poor performance or misconduct of another. The goal was to prevent situations where someone might

be treated better simply because she or he was related to another employee.

### 4. Job Flexibility Policy

WB's Employee Handbook also included a Flexibility/Job Rotation and Cross-Trained

Employee Policy, which stated:

> The success of [WB] is based upon flexibility. Employees are encouraged to learn as many jobs as possible. In this manner, you become better able to respond to the company's production needs. You also have the opportunity for personal growth and greater job satisfaction.
>
> Employees may rotate to different job assignments within your work section, and there may be instances when you are moved to different work assignments on a temporary basis in other sections or shifts of the plant.
>
> The result is a system that can quickly and efficiently cope with change in equipment, personnel, and production needs. Because employees are cross trained, it is easier to keep you employed when work declines by reassigning you within the Company. This personnel movement also helps to insure the most important benefit to all of us – job security.

(Doc. No. 33-12 at 17.)

WB encouraged cross-training, and Production Associates could earn more money if they trained on and learned more than one position on the line. However, cross-training on multiple jobs was not required. (*See, e.g.*, Allen Dep. 19, 61–62; Steelman Dep. 29–30; Newsome Dep. 65–66.) Flexibility, however, was required.

### D. Stafford's Employment History with WB

Stafford first worked at the Bakery from approximately May 11, 2017, to September 25, 2017, on the production line. During her first period of employment, Stafford received a written warning for an altercation in the locker room with another employee. Her employment ended after she got into a physical altercation with her Shift Leader, Lamar Gaston (African American, male), in which she yelled and threw her helmet at him and quit on the spot.

Stafford reapplied to WB in January 2022 under a different name, using her middle name (Sherrell) rather than her first name. WB had undergone a change in ownership and significant staffing changes between 2017 and early 2022, and, as a result of the staffing changes and the fact that Stafford applied under a different name, HR did not identify Stafford as a prior employee or review her prior record during the hiring process in 2022.[3]

Stafford began her second period of employment at the Bakery on February 1, 2022, as a Production Associate on A Shift, working days from 6:00 a.m. to 6:00 p.m. (*See* Jan. 14, 2022 Offer Letter, Doc. No. 33-7 (offering employment "in the Day-Shift Production department as a Production Associate"); *see also Complaint*, Doc. No. 1 ¶ 6 ("WB rehired Ms. Stafford on February 1, 2022, as an A-shift Production Associate at the Lebanon location.").) Stafford testified that she had received the Employee Handbook and WB's policies on workplace conduct and serious misconduct, and she signed forms acknowledging her receipt of the Handbook and agreeing that she had received a copy of the Code of Conduct and would abide by it. (Stafford Dep. 55–56; Doc. No. 33-13, at 2, 3.)

Stafford was initially trained as a fryer operator and assigned to the fryer between Lines 4 and 5 on most shifts. As a fryer operator, she was responsible for operating the donut fryer, maintaining the correct temperatures, checking donut weights, and making sure that the donuts met WB's product standards and specifications.[4]

---

[3] WB suggests, but does not actually state, that it would not have rehired the plaintiff if it had known about her prior employment history with the Bakery.

[4] The plaintiff purports to dispute that she was employed as a Production Associate, pointing out that she was "assigned to the fryer operator position" and claiming that her "title" was "fryer operator." (*See* Stafford Dep. 53, 25.) Her testimony regarding the line position for which she was trained and to which she was initially assigned is not inconsistent with the other evidence in the record, which establishes that she was officially employed as a Production Associate, one of the positions of which was fryer operator.

The fryer was a shared piece of equipment between lines 4 and 5; consequently, when she operated the fryer, Stafford worked two lines and technically had two different Line Leads. (*See* Stafford Dep. 122 ("I was in the middle. I was, like – I was the fryer op between both.").) As Stafford also explained, however, at the time, she was still in training when she started on A shift. (Stafford Dep. 122.) According to Stafford, "It was me and another lady named Jennifer. Jennifer would stay on 4 and I would be on 5. Generally, I would go over there just to learn some things that were different between the two lines, but I stayed on 5." (*Id.*) During that time, Tyrone Debow was the A Shift Line Lead for Line 5, and the plaintiff's mother, Sherry Clemmons, was the A Shift Line Lead for Line 4. Stafford acknowledged that it was possible that her mother "could" have supervised her but she "wasn't supposed to." (Stafford Dep. 130.) Stafford also maintains that her mother never supervised her and that Debow was her Line Lead when she was on A shift. (Stafford Dep. 26, 29.) It appears to be undisputed, however, that, once she was fully trained, Stafford would have been working as the fryer operator on both lines 4 and 5. (*See* Demps Dep. 62; Steelman Dep. 62.)

HR was not initially aware of the relationship between Stafford and her mother or that Stafford's mother, Clemmons, would have technically been Line Lead for Line 4 when Stafford was working as fryer operator for lines 4 and 5. WB asserts that it was a violation of its Conflict of Interest Policy for Stafford to report directly to her mother. The plaintiff, again, denies that she ever reported directly to her mother and asserts that the conflict could have been avoided by moving her to Line 1 or Line 2. (*See* Allen Dep. 14 (confirming that "a fryer op on line 4 could be assigned to line 1 or 2").) However, as WB's HR manager, Dorcas Wah-Abel, testified, there was always the possibility that people would have to be moved around within a shift, "just because some people call out or we're short or if one line is not running." (Wah-Abel Dep. 87.) Because

of that possibility, if one family member could be placed in a supervisory position over the other, WB "tr[ies] to make sure [family members are] not on the same shift, to the extent possible." (Wah-Abel Dep. 87.)

In late February 2022 (after Stafford had been back at WB for almost a month), Wah-Abel learned via word of mouth from other employees that Stafford, as fryer operator on lines 4 and 5, was reporting directly to her mother as Line Lead. Upon learning that Stafford was working on a line where she could be reporting directly to her mother, Wah-Abel met with the Bakery Manager and the Production Manager and recommended that Stafford be moved off of A shift as soon as possible. (Wah-Abel Dep. 95.)

Thomas Steelman, a Shift Manager on C Shift, recalls being told that Stafford was being moved to his shift so as not to be working the same shift as her mother. (Steelman Dep. 82.) Other employees recalled that Stafford was moved because of complaints against her and because she had "attitude" issues. Christina Allen, the plaintiff's A shift Shift Manager, testified that HR instructed her and the other shift manager, Jacob Collins, to notify Stafford of the shift change decision. (Allen Dep. 32.) Allen recalled little about the conversation, but her understanding was that Stafford was being moved "due to issues on her shift with her attitude" and complaints by other team members. (Allen Dep. 33.) Devon Ripley and Robert Newsome also believed that the move was "because of conflict with other team members on A shift." (Ripley Dep. 61; *see also* Newsome Dep. 94 ("I just had heard that they . . . were moving her due to some complaints . . . about her . . . not getting along with other team members.").) Newsome believed that there had been an investigation into these complaints. (Newsome Dep. 98–101.) Wah-Abel was aware of complaints, but, at the time of her deposition, could not remember whether they predated the plaintiff's move from A shift to C shift. (Wah-Abel Dep. 103.)

In any event, Wah-Abel made the decision to move Stafford from A Shift to C Shift. On March 2, 2022, Allen and Jacob Collins met with Stafford and informed her that she would be moving to C Shift starting on March 9, 2022. The only difference between A shift and C shift was that they operated on alternate days each week on a two-week rotation. As Demps explained, in one week A shift would work Monday and Tuesday, be off Wednesday and Thursday, and then work Friday, Saturday, and Sunday. (Demps Dep. 12.) The following week, A shift would be off Monday and Tuesday, work Wednesday and Thursday, and be off Friday, Saturday, and Sunday. (*Id.*) C shift employees worked on the days that A shift employees were off. (*Id.*; *see also* Stafford Dep. 57.) Stafford's hours and pay remained the same when she moved to C shift. (Stafford Dep. 57–58.) The plaintiff asserts that the shift change disrupted her child-care arrangements, but it is undisputed that, after the change, she was able to obtain childcare from her mother free of charge, since her mother worked opposite days. (Stafford Dep. 111–13.)

Jennifer Hills (African American, female) took over as the fryer operator for Lines 4 and 5 on A Shift after WB moved Stafford to C Shift.

After her move, Stafford remained a Production Associate and was primarily assigned as a fryer operator. (Stafford Dep. 54–55; Demps Dep. 79.) However, she also understood that employees could be "moved around to different positions as needed." (Stafford Dep. 54–55.) She testified that she observed other employees having to help out in situations where something needed to be done, and she understood that she might also have to help out other employees. (Stafford Dep. 75.) She recalled an instance when she arrived to work and Demps told her that they were "extremely short that particular day," and Stafford was "put in a position [she] did not know on a new line that [she] had never touched before." (Stafford Dep. 79.)

According to Steelman, when Stafford was moved to C shift, he was trying to move her to packaging because C shift had enough fryer operators. (Steelman Dep. 78.) He explained to Stafford at some point that he needed a package operator and that she was being "moved to start learning packaging." (Steelman Dep. 78.) Steelman explained to Stafford that no one had a permanent position and that people were moved around as needed. (Doc. No. 33-14 at 3.)

The plaintiff claims that she was "required" to cross-train but that White employees were not required to cross-train. (Stafford Dep. 75–76.) As set forth above, WB's policy is typically to encourage but not require cross-training. The plaintiff's testimony, however, does not show that she formally completed cross-training. According to the plaintiff, after she completed her training for fryer operator in A shift, she received a "step-up card." (Stafford Dep. 77.) When an employee is formally trained or cross-trained on a piece of equipment or position on the line, she receives a "step-up card per area that you're being cross-trained for. And if you are being cross-trained every day, you receive a step-up card. And at the end of the day you have to sign off what you've learned each section that you know at this point." (Stafford Dep. 76.) According to Stafford, when she moved to C shift, she would be "randomly" moved to other positions on the line, but she never received documentation or paperwork saying that she was trained on any other position. (Stafford Dep. 77; *see id.* ("So the way it was done, it wasn't done that I was being cross-trained. I was just being moved just to move me."); *see id.* at 79 (stating that, on the day Demps moved her from fryer operator because they were short staffed, she was just "fill[ing] a spot that they needed for the day").)

Although Stafford testified that she believed that White employees did not have to cross-train and that she was being asked to cross-train because she was Black, the only example she gave was that of Cathy, a White fryer operator who had been working as a fryer operator since at least

2017, was still a fryer operator when the plaintiff returned to the company in 2022, and had never been cross-trained at any other position. (Stafford Dep. 76.) Thomas Steelman, a White employee, testified that he was cross-trained on every position on the production line and that he never asked to be cross-trained: "They just . . . asked and I went for it." (Steelman Dep. 49.) The plaintiff also acknowledged that it was not a "bad thing" that WB "want[ed] [her] to cross-train . . . and learn[] different things." (Stafford Dep. 79.) She also affirmatively stated that she was "not saying that they were having [her] cross-train on different things because of [her] race." (Stafford Dep. 79.) Though her testimony is confusing and conflicts with the allegations in her Complaint, Stafford's actual complaint appears to be that she was *not* formally cross-trained and did not receive step-up cards to acknowledge that she had been trained on different equipment. Instead, she was just randomly moved around without receiving such formal training. She appears to be suggesting that other employees, such as Cathy (who had been employed for a minimum of five years by that time, since the plaintiff states she had worked with her in 2017), were not moved around randomly or, in any event, were not being moved around as frequently as she was. Notably, however, Cathy was not a probationary employee, and there was evidence in the record that she received training on other stations early in her tenure with the company. (*See, e.g.*, Steelman Dep. 79.)

### E. Employee Complaints About Stafford

The plaintiff was aware, because Allen told her, that people were complaining that she and her mother were working together on A shift. (Stafford Dep. 66–67.) The plaintiff was aware of one employee, Steven Coble, who she believed probably complained about her working with her mother. (Stafford Dep. 66.) The record does not contain a written complaint by Coble, but at least five other A shift employees submitted written complaints to Christina Allen about Stafford's bad attitude, leaving early, and generally rude behavior. (Doc. Nos. 33-18 through 33-21.) In one of

these, dated February 27, 2022,[5] Eduardo Carmona specifically stated his belief that Stafford had a bad attitude in general, created "a bad work environment," left her shift early every day even though she was in her training period, and "feels power since a relative of hers is a leader." (Doc. No. 33-18 at 2–3.) He also complained that Stafford had unfairly accused him of not changing log-in information on a work screen. (*Id.* at 2.) The plaintiff "disputes" this statement, asserting that Carmona was retaliating against her for her complaint that he had used other employees' log-ins. (Doc. No. 39, Pl.'s Resp. Statement of Undisp. Material Fact ¶ 56.) She does not dispute that he logged a complaint about her, however.

### F.    The Plaintiff's Complaint About Moving to C Shift

After being informed of the move to C shift, Stafford verbally complained to Allen and Wah-Abel that the move was discriminatory because she was being moved while White and Hispanic employee relative pairs were allowed to work on the same shift and were not moved. (Stafford Dep. 60–62.) Allen does not recall the complaint and, in any event, had no involvement in supervising the plaintiff after she was transferred.

Wah-Abel had no recollection of the complaint until the plaintiff produced, shortly before deposing Wah-Abel, an audio-recording of the conversation made by the plaintiff without Wah-Abel's knowledge. (Manually filed as Doc. No. 42.)[6] The recording reflects that the plaintiff opened the conversation with Wah-Abel by telling her that she wanted to talk about "being forced to change shifts because of [her] mother." She pointed out that there were several other related employees who worked together. The first pair of related employees she identified were "Felicia [Bass] and her son." As the defendant points out, Felicia Bass and her son are African American.

---

[5] The plaintiff objects that the other complaints are not dated.

[6] This audio recording is somewhat difficult to understand, and neither party has produced a transcript of it.

During the plaintiff's conversation with Wah-Abel, Wah-Abel merely noted that Bass was not her son's direct supervisor, so the situation was different from the plaintiff's.

The other related employees to which the plaintiff referred were Thomas Steelman and his brother, Paul Steelman. Wah-Abel responded that Thomas Steelman was being moved to a different shift the following week. The plaintiff nonetheless stated that, when she had first been told she was being moved, she believed it was because she was Black, because the Steelman brothers (White) were allowed to keep working together. Wah-Abel apparently did not believe the plaintiff's complaint was significant enough to warrant investigation into whether racism was involved. (*See* Wah-Abel Dep. 157–60.) During her deposition, the plaintiff identified five pairs of relatives she believed were allowed to work on the same shift, three of which were White and two of which were Black. (Stafford Dep. 82–92.) The testimony about whether and when WB investigated the plaintiff's complaint about other relative pairs (including additional relative pairs, both Black and White, included in her EEOC complaint) is equivocal but not material.

In the same recorded conversation, the plaintiff complained to Wah-Abel that she had been "harassed" by Steven Coble, who was gossiping about her because of her working with her mother. Stafford did not indicate or imply that the harassment was based on race. Rather, it was because she was working with her mother. In her deposition, Stafford testified that Steven Coble "harassed" her by staring at her, and she identified two staring incidents. (Stafford Dep. 65–66.) Wah-Abel said she would have to "look into" it and asked the plaintiff if she would provide a written statement. The plaintiff replied that she would be happy to, but she never provided a written statement about Coble. Wah-Abel apparently did not investigate the plaintiff's complaint about Coble's harassment either.

According to the plaintiff, Christina Allen told her people were complaining about her working on the same shift as her mother, but she was never made aware while she was working on A shift that other employees were complaining about her behavior. (Stafford Dep. 67, 81.) No one, at any point, made derogatory comments about Stafford's race, mentioned her race, or told Stafford that anyone said anything about her race during discussions with her about her move to C Shift. (Stafford Dep. 58, 64.)

### G. Stafford's Move to C Shift

Stafford moved to C Shift on or about March 9, 2022.

According to an undated Memorandum in the plaintiff's file and corroborated by an email to Wah-Abel dated April 20, 2022, Steelman sat down with Stafford shortly after her move to C Shift to "talk about the issues" she had on A Shift and to let her know that she would have a "clean slate and an opportunity to start over" on his shift. (Doc. No. 40-23 at 1; Doc. No. 40-26.)

Demps testified however that, once Stafford was assigned to her shift, they "started having issues with her as far as [her] not wanting to do what was asked of her." (Demps Dep. 60.) Demps relayed an incident in which Stafford came to her complaining about a scale on her line. Demps tried to explain that the scale was not really malfunctioning, it was just being hit with an air draft that caused the number on the scale to "fluctuate just a little bit," and she explained to Stafford how to deal with the issue. (Demps Dep. 60.) She "even had the quality manager come out and talk to her and try to explain" the issue and also told Stafford she would try to get a new scale but, until then, Stafford should just use the scale on line 4. (Demps Dep. 60–61.) Stafford responded that she was not doing that and she would just go home. (Demps Dep. 61.) Demps told her she could go home because "they [were] her points." (Doc. No. 40-15 at 5.) Demps was told by her shift manager to write up a statement and send it to HR, which she did. (Demps Dep. 61; Doc. No. 40-15 at 5; Steelman Dep. 88 ("I would have told her if she felt like writing a statement she could

. . . .").) Demps could not recall if Stafford actually left that day. (Demps Dep. 87.) Stafford testified that she told Demps, "No, I'm not running back and forth because it was your job to make sure that [the scale] was fixed before I even got out here." (Stafford Dep. 100.) But she also stated that she "didn't even have to deal with going back and forth because . . . Leslie in quality brought me a scale." (Stafford Dep. 100.)

In the same email, dated April 20, 2022, Demps reported that Stafford had approached her to report that she was "not pleased with where she was placed on 4/12/2022," when she was required to do "rework" instead of being put on fryer operator. (Doc. No. 40-15 at 5.) According to Demps, Stafford told her that, "if line 4 and 5 are running she needs to be fryer operator." (*Id.*) Demps noted that she had not even been at work that day but that "fryer op is not her permanent place as [she had] 2 other people that are signed off on fryer op and [she tried] to rotate them." (*Id.*)

Stafford was also assigned to packaging on some shifts, instead of fryer operator. LaToya Bryant submitted a memo to HR dated April 26, 2022, stating that she "[w]ent to packaging to check on things" and did not see Stafford at the station. (Doc. No. 33-14.) She asked another employee how Stafford was doing, and that employee responded, "she hasn't done much and hasn't really tried to learn anything back here," was "wondering [sic] off" and "on "different lines talking." (*Id.*) Another employee told her he had not worked with Stafford yet but had been told she "keeps walking off and not doing anything." (*Id.*) Bryant reported these complaints to Ripley and another shift manager. (*Id.*)

According to WB, Steelman and Ripley counseled Stafford on these issues to determine the problem and to try to find a solution. According to a Memo to HR dated April 20, 2022, Steelman met with Stafford to talk about these issues, and Stafford told him the same thing she

had told Demps. That is, regarding the scale issue, when Demps told her she could "just use [the other] scale until they can get a new one," the plaintiff "replied I'm not doing that because it should have been fixed already." (*See* Doc. No. 33-14 at 3.) Stafford also confirmed that she had told Demps that she was unhappy about not being placed on fryer op if Lines 4 and 5 were running. Steelman told her that "no one has a permanent position," and he "named off multiple people who we move around from place to place." (*Id.*) Steelman testified that his Memo to HR was not a disciplinary write up but was just to "giv[e] HR information," that Stafford "was not happy with stuff," and that things were happening on the shift that were "escalating into issues." (Steelman Dep. 89–90.)

According to the plaintiff, during her probationary period, Ripley told her she was "doing a good job" and meeting her production goals, and Stafford was never informed of others' complaints about her attitude. (Ripley Dep. 58–60; Stafford Dep. 100, 101–02.)

### H. The Plaintiff's Termination

In late April 2022, after receiving numerous written complaints about Stafford, Wah-Abel met with Devon Ripley and Thomas Steelman, and possibly Robert Newsome, to discuss the complaints, whether Stafford was a good fit for the role, and whether they should take any action with respect to Stafford's employment. During their depositions two years later, none of these individuals had a clear recollection of the discussion.[7] (*See* Ripley Dep. 81, 104; Wah-Abel Dep. 136–37; Newsome Dep. 103–05; Steelman Dep. 100–01.)

Wah-Abel, Steelman, and Ripley met with Stafford on April 26, 2022, to inform her that she was being terminated. According to the plaintiff's termination letter dated April 26, 2022 and signed by Wah-Abel, the decision was made to terminate Stafford "due to unsuccessful completion

---

[7] Steelman had essentially no recollection of the discussion. (*See* Steelman Dep. 103–04.)

of probationary period." (Doc. No. 33-23 at 2.) Ripley's recollection was that Stafford was terminated because she was "just not a fit for the team." (Ripley Dep. 85.) Wah-Abel testified that she was terminated because of all of the complaints the company had received. (Wah-Abel 155.)

During the termination meeting, according to the plaintiff, Steelman started off by saying, "We've been watching you during your probationary period and we feel that you have not completed your probationary period." (Stafford Dep. 102.) Stafford began to ask what she had done or not done and pointing out that she had never had any one-on-one meetings with anyone. (*Id.*) Wah-Abel started to respond, but, at that point, Stafford "stopped listening." (*Id.*) Wah-Abel, after listening to an audio-recording of the termination meeting recorded by the plaintiff, testified that, after Stafford was notified of her termination, she became verbally abusive to Wah-Abel, cursing at her, berating her, speaking over her, and cutting her off when Wah-Abel attempted to explain the termination decision. (Wah-Abel Dep. 185–86; *see also* Steelman Dep. 116 ("[A]ll I can remember is just saying [to Stafford] that her services were no longer needed, and then she started getting upset, cursing, yelling, screaming, cussing at Ms. Wah-Abel."); *accord* Ripley Dep. 87.) The plaintiff asserted that they were just "mad because she snuck back in," and she slammed the door as she exited the room. (Wah-Abel Dep. 154; Steelman Dep. 114, 116; Ripley Dep. 87.)

On April 25, 2022, the day before her termination, Stafford went to Hannah Gunn, a former WB Talent Acquisition Leader, to request a "form to write a statement." (Stafford Dep. 104–05; Gunn Dep. 8, 13–14.) She did not tell Gunn what the statement was for. (Stafford Dep. 105.) Gunn directed her to Susan Nimmo, HR Coordinator, because Gunn did not have the form. (Stafford Dep. 105.) When she went to Susan Nimmo, Stafford "stood there, said [she] needed the form." (Stafford Dep. 105.) Nimmo asked her if she wanted to talk about it, and Stafford told her, "No, I'd rather write it down in a statement." (Stafford Dep. 105.) Nimmo handed Stafford the form she

requested—WB's standard incident report form. Stafford did not tell her what she wanted to make a complaint about. (Stafford Dep. 105–06.)

It is undisputed that neither Gunn nor Stafford informed anyone, including Stafford's supervisors or Wah-Abel, that she requested a form to make a complaint. Stafford never submitted a written complaint prior to her termination, and, in any event, neither Gunn nor Nimmo was involved in the decision to terminate Stafford's employment.

WB did not replace Stafford in her position on C Shift after her termination.

WB terminated other employees for unsuccessful completion of the probationary period around the time of Stafford's employment, regardless of race. (Roach Aff. ¶ 9.)[8]

## I.    This Lawsuit

The plaintiff initiated this lawsuit in April 2023, after exhausting her claims with the Equal Employment Opportunity Commission ("EEOC") and within ninety days after receiving a Notice of Right to Sue from the EEOC. (Doc. No. 1; *see id.* ¶ 3.) She asserts claims for race discrimination, "harassment," and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, and 42 U.S.C. § 1981. The Complaint alleges that the plaintiff's transfer to C shift from A shift constituted race discrimination and that she complained about discrimination and harassment on the basis of race to Christina Allen and Dorcas Wah-Abel when

---

[8] Roach submitted this Affidavit in his capacity as Director of Human Resources for FGF Brands, Inc., which has owned WB since December 2021. (Roach Aff. ¶¶ 2, 4.) He has held that position since November 2022, after Stafford's employment. His statement regarding the termination of other employees is apparently based on his review of WB's employment records rather than from personal knowledge. The plaintiff purports to dispute this statement on the basis that Roach was not employed at the time of her employment and termination, did not investigate her claims, and was not consulted regarding the company's response to Stafford's EEOC charge. None of these facts, however, disqualifies him from testifying about the termination of other employees around the same time frame.

she was moved from the A shift to the C shift. (Doc. No. 1 ¶¶ 17–19.) The plaintiff also alleges that she complained to Steelman on April 21, 2022 that Demps was discriminating against her due to race; that she subsequently asked Susan Nimmo for a form to "write a formal written complaint of race discrimination"; and, "upon information and belief," that Wah-Abel and Robert Newsome overheard her request for "documents to file a formal complaint." (Doc. No. 1 ¶¶ 32, 34, 35.) She asserts that her termination was "because of her race" and that she suffered retaliation for having complained about being treated differently because of her race. She characterizes as harassment and discrimination the defendant's failure to investigate her complaints of discrimination and retaliation, failure to take "prompt remedial action," and treating her differently than similarly situated White co-workers. (*Id.* ¶ 48.)

After the parties completed discovery, the defendant filed the subject Motion for Summary Judgment (Doc. No. 32), seeking judgment in its favor on all claims set forth in the Complaint. Its motion is supported by a Memorandum of Law, Statement of Undisputed Material Facts ("SUMF"), and the evidentiary material cited in the SUMF. (Doc. Nos. 34, 33, and exhibits filed with Doc. No. 33.) The plaintiff filed a Response in Opposition to the motion, a Response to the SUMF, and her own Statement of Additional Facts ("SAF"), along with the evidence on which she relies. (Doc. Nos. 38, 39, 40.) The defendant filed a Reply as well as a Response to the SAF. (Doc. Nos. 44, 45.)

## III.    DISCUSSION

Claims of race discrimination and retaliation under the THRA and § 1981 are reviewed under the same standards as claims brought under Title VII. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (Title VII and §1981); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (Title VII and THRA). Accordingly, the court analyzes the plaintiff's claims exclusively under Title VII, with the understanding that her success or failure in

establishing a right to relief under Title VII necessarily entails the same conclusion with respect to her claims under § 1981 and state law.

###### A.    Discrimination Claims

######    1.    *Legal Standards*

Title VII makes it unlawful for an employer "to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e-2(a)(1). To defeat summary judgment, "a plaintiff must present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race was a 'motivating factor' for the adverse employment action." *Goodwin v. Newcomb Oil Co., LLC*, No. 23-5594, 2024 WL 1828304, at *3 (6th Cir. Apr. 26, 2024) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003)); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020) ("From the ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on [race].").

A plaintiff can make this showing through "direct evidence" or, if—as here—no such evidence exists, with "indirect evidence" under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973). *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). The *McDonnell-Douglas* framework requires a plaintiff to first establish a *prima facie* case of discrimination. If she succeeds in doing so, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the termination. *Id.* Should the defendant meet this burden, the burden shifts back to the plaintiff to show that the proffered reason for termination was not the true reason, but merely a pretext for discrimination. *Id.* at 607.

The burden of establishing a *prima facie* case of disparate treatment "is not an onerous one." *Id.* at 606 (quoting *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)). Generally, a plaintiff makes a *prima facie* case by showing that (1) she is a member of a protected class, (2) she was qualified for the job, (3) she suffered an adverse employment decision, and (4) she was replaced by or treated differently than a similarly situated employee outside the protected class. *Id.* at 606–07.

### 2. Transfer to C Shift

The defendant argues that the plaintiff cannot establish a *prima facie* case of race discrimination in connection with her transfer to C shift, first, because the plaintiff cannot establish that the transfer qualified as an adverse employment action. (Doc. No. 34 at 11.) It also argues that the plaintiff has not presented evidence of similarly situated White employees who were treated differently than she was, and that, even if she could establish a *prima facie* case, she cannot establish that the defendant's proffered reasons for the action were pretext for discrimination. The plaintiff responds that the transfer qualified as an adverse employment action, because the action "caused [her] the hardship of finding alternative childcare." (Doc. No. 38 at 24.)

The Supreme Court has recently reiterated that, to establish an adverse employment action for purposes of a discrimination claim under Title VII, the employee does not have to show that the change in employment conditions caused her to suffer "significant," "serious," or "substantial" harm. *Muldrow v. City of St. Louis*, Missouri, 601 U.S. 346, 354–55 (2024). However, she must show that the transfer

> brought about some "disadvantageous" change in an employment term or condition. The words "discriminate against," we have explained, refer to "differences in treatment that injure" employees. Or otherwise said, the statute targets practices that "treat[] a person worse" because of sex or other protected trait. And in the typical transfer case, that "worse" treatment must pertain to—must be "with respect to"—employment "terms [or] conditions." § 2000e–2(a)(1). The "terms [or] conditions" phrase, we have made clear, is not used "in the narrow

contractual sense"; it covers more than the "economic or tangible." Still, the phrase circumscribes the injuries that can give rise to a suit like this one. To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment.

*Id.* at 354–55 (most internal citations omitted).

Under *Muldrow*, Stafford has not shown that her transfer from A shift to C shift constituted a disadvantageous change—or, indeed, any change—in any employment term or condition. The schedule for the two shifts was exactly the same, on the same regular two-week rotation with only the order of the rotation reversed. Stafford received the same pay and kept the same job title. The plaintiff claims that she was disadvantaged because she had to shift around her childcare arrangement, but childcare arrangements were not a condition or term of her employment. Rather, it was a condition of her home life. Moreover, she was given some time before the change went into effect in order to "get [her] child care situation taken care of," and, ultimately, her mother was able to provide her childcare for free, since they were no longer working the same shift. (Stafford Dep. 63, 111.) Unlike the plaintiff in *Muldrow*, the transfer did not result in different "responsibilities, perks, and schedule." *Id.* at 351. Unlike the plaintiffs in other cases referenced disapprovingly in *Muldrow*, Stafford was not required to work in a less desirable job environment, to work the nightshift, or to supervise fewer employees. *Muldrow*, 601 U.S. at 355–56.[9] The plaintiff has not pointed to any tangible or intangible harm "respecting an identifiable term or condition of employment." *Id.* at 355.

---

[9] The court is not holding that a schedule change that gave rise to a hardship in arranging childcare could never qualify as an adverse employment action. But generally, under *Muldrow*, a schedule change that could reasonably be anticipated to adversely affect childcare arrangements— such as one that required working the nightshift or more weekends or varied continuously—would likely qualify as an adverse employment action, even if childcare was not an issue. Here, the plaintiff's schedule did not actually change; only the order of the weekly rotation was reversed.

Because the plaintiff cannot establish that the transfer was an adverse employment action, she cannot establish a *prima facie* case of employment discrimination based on that action, and the court has no need to consider the other elements of the *prima facie* case or the remaining steps of the *McDonnell Douglas* framework. The defendant is entitled to summary judgment on the plaintiff's discrimination claims based on her transfer to C shift.

3.      *Termination*

The defendant argues that Stafford cannot establish a *prima facie* case of discrimination based on her termination, because she cannot show that any similarly situated employee outside her protected category was treated differently or that she was replaced by an employee outside her protected class. WB also argues that Stafford cannot show that its proffered reasons for the termination were pretextual. (Doc. No. 34 at 16–19.)

The plaintiff does not address WB's argument in support of summary judgment on the discrimination claims based on termination. (*See* Doc. No. 38, *passim*.) The plaintiff's failure to respond to an argument on summary judgment signals abandonment or forfeiture of the claim. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) (citing *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir. 2022)). "To address an argument in the district court, 'a litigant must provide some minimal argumentation in favor of it.'" *Id.* (quoting *United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009)).

The court finds that the plaintiff has abandoned her claim of discrimination premised upon her termination. Even if she had not, the court is persuaded by the defendant's argument that the plaintiff cannot show that the reasons for her termination were pretextual, as discussed below in connection with her retaliation claims.

### B.     "Harassment"

The Complaint also purports to assert claims for harassment based on race. The plaintiff has not responded to the defendant's arguments in support of dismissal of these claims, and the court finds that the harassment claims have also been abandoned.

Even if the plaintiff had not abandoned the claims, a "harassment" claim—more accurately referred to as a hostile work environment claim[10]—"requires proof that (1) plaintiff belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017).

Stafford cites two examples of alleged harassment: (1) that a male employee (Steven Coble) was "looking at her" and reporting overly long breaks and favoritism from her mother while she was on A Shift, and (2) that her Line Lead on C Shift (Demps) disproportionately scrutinized her break periods. (Compl. ¶¶ 26, 30; Stafford Dep. 65–66.) Stafford has produced no evidence that these actions were based on race. And even if she had, this purportedly harassing conduct was not sufficiently severe that it affected a term, condition, or privilege of her employment. The defendant is entitled to summary judgment on the plaintiff's harassment/hostile work environment claims.

### C.     Retaliation Claims

Title VII also prohibits retaliation against employees who oppose discriminatory employment practices. 42 U.S.C. § 2000e-3(a). Retaliation claims that rely on indirect evidence,

---

[10] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.").

like discrimination claims, are analyzed under the *McDonnell Douglas* framework. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). To establish a *prima facie* case of retaliation, the plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known to the defendant; (3) the defendant thereafter took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). Notably, Title VII retaliation claims—as distinct from discrimination claims—"require traditional but-for causation, wherein a plaintiff must show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Id.* at 614–15 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)).

If the plaintiff makes the requisite showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action, in response to which the plaintiff must proffer evidence from which a reasonable jury could conclude that the defendant's proffered reason "was a pretext for retaliation." *Id.* at 614 (quoting *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017)). Although the burden of production shifts, the plaintiff at all times bears the burden of persuasion. *Id.*

### 1. The Plaintiff's Prima Facie Case

Apparently recognizing the weakness of the evidence supporting her discrimination claims, the plaintiff devotes the majority of her briefing to her retaliation claims. Stafford has identified two complaints that she contends qualify as protected activity: (1) a complaint of discrimination

to Wah-Abel shortly after she moved from A shift to C shift in early March 2022;[11] and (2) her request for a written complaint form from HR the day before her termination.

Regarding the latter event, it is undisputed that the plaintiff simply requested a standard incident report form and never disclosed to Gunn or Nimmo the nature of the complaint she intended to make. In addition, it is undisputed that neither Gunn nor Nimmo had any involvement in the decision to terminate the plaintiff's employment and that those involved in the decision—Wah-Abel, Newsome, Ripley, and Steelman—had no knowledge that the plaintiff had requested a complaint form the day before her termination. (*See* discussion *supra*, at 20–21.) The plaintiff, in any event, never completed or turned in the complaint form.

Because Stafford never told anyone she intended to make a complaint based on race discrimination and never actually submitted a written complaint based on race discrimination after requesting the incident report form, Stafford lacks sufficient evidence to persuade a reasonable jury that her request for a complaint form qualifies as activity protected by Title VII. Moreover, even if she could satisfy this element, she cannot show that the decisionmakers knew that she had engaged in protected activity or, therefore, that there was a causal connection between protected activity and her termination. As a matter of logic, protected activity of which the decisionmakers were unaware could not have been the cause of her termination. *Accord Brown v. City of Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) ("[O]ne necessary element of the *prima facie* case is that the official committing the adverse action have knowledge of the protected activities.")). In short, the defendant is entitled to summary judgment on the plaintiff's claim that she was terminated in

---

[11] Stafford alleges that she made the same complaint to Allen when she was informed about the move, stating that "it's not fair that I should have to move because nobody else has to move. They're only making the black people move." (Stafford Dep. 60.) Allen, however, was not involved in the termination decision and had no role in supervising Stafford after she changed shifts. (Allen Dep. 48.)

retaliation for having requested a complaint form from Nimmo the day before her termination.

The plaintiff also claims that she complained about race discrimination to Wah-Abel around the time of her transfer to C shift in early March and that her termination on April 26 was in retaliation for that protected activity. The defendant argues that (1) the plaintiff cannot establish a causal connection between the plaintiff's protected activity and her termination; and (2) even if she could, she cannot show that WB's reason for firing her—that she was not a good fit for the company, based on complaints during her probationary period about her attitude, her disregard of instructions from supervisors, and her refusal to perform essential job tasks—was pretext for retaliation.

In response, the plaintiff argues that she has identified "several" materially adverse actions aside from her transfer to C shift and her termination, including that she was subjected to "heightened scrutiny" of her break times by her new Line Lead on C shift, Heather Demps; that she was "forced" to cross-train and work at other stations on the line, even though she had been trained as a fryer operator and told that she would work as fryer operator; that no one investigated the "discrimination" claims she had articulated to Wah-Abel after being told about her transfer; and that she had to get alternative childcare after her transfer to C shift.

Even if these actions qualify as "materially adverse" for purposes of a retaliation claim (as opposed to a discrimination claim), insofar as they "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 (6th Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)), none of them can be shown to be causally related to her purported complaint about discrimination.

First, the plaintiff's claim that she was subjected to heightened scrutiny of her break time by Demps is entirely unsupported, and there is no suggestion that she was disciplined in connection with this heightened scrutiny or that her breaks or job performance generally played any part in her termination. In addition, the plaintiff was still on her probationary period, so being subjected to "heightened scrutiny" was somewhat to be expected. Regardless, Stafford does not suggest that Demps knew that Stafford had engaged in protected activity or that Demps was involved in the termination decision.

As for cross-training, the plaintiff concedes that WB's wanting her to cross-train was "not a bad thing," and her actual complaint about cross-training during her deposition was that she had not gotten credit for being cross-trained. (Stafford Dep. 79.) However, there is no evidence that Stafford had completed cross-training on any other station, and it is undisputed both that Production Line employees were expected to help out where needed and that the plaintiff complained about being asked to move to different tasks on the line. Regardless, the supervisors responsible for assigning her position were not aware that she had made a discrimination claim.

As for Wah-Abel's failure to investigate the plaintiff's "discrimination" claim, the audio-recording of the conversation establishes that Wah-Abel believed that the plaintiff's concerns had been adequately addressed, because the first related pair of employees identified by the plaintiff (who were Black) did not involve a supervisory relationship; the second pair (Thomas Steelman and his brother) were being separated the following week; and the fact that the plaintiff identified both Black and White employees whom she believed were treated differently from her obviated any suggestion of race discrimination. And, as for the complaint about Steven Coble harassing her because she was working with her mother, the plaintiff did not suggest that the harassment was race-related; she never submitted a written statement, as requested by Wah-Abel; and her move to

C shift meant that she was no longer working either with Coble or with her mother, thus eliminating both sources of contention.

Finally, as for the transfer causing her to have to obtain alternative childcare, this event was related to the transfer, as discussed above, and could not have been causally related to Stafford's allegedly engaging in protected activity, which occurred after the decision to move her to C shift. Thus, there could not have been a causal relationship between them.

This leaves only the question of whether the plaintiff has presented sufficient evidence of a causal connection between her complaining that her transfer was discriminatory and her termination, for purposes of the *prima facie* case. The plaintiff argues that the close temporal proximity, viewed in light of the other adverse actions referenced above, is sufficient to give rise to an inference of causation. WB argues that the passage of approximately seven weeks between the two events is not sufficient, standing alone, to support an inference of causation and that, in any event, its receipt of multiple complaints about the plaintiff following her transfer breaks whatever causal chain might otherwise exist. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020) ("[A]n intervening cause between protected activity and an adverse employment action dispels any inference of causation.").

It is well established that causation, in the retaliation context, means "but for" causation—meaning that a defendant will be entitled to summary judgment "[s]o long as [nondiscriminatory] factors were sufficient to justify [its] ultimate decision." *Redlin*, 921 F.3d at 615. "Temporal proximity alone generally is not sufficient to establish causation." *Kenney*, 965 F.3d at 448 (citations omitted). "Exceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Id.* at 449 (citations omitted). In *Kenney*, the court found that the "roughly 75-day delay between [the plaintiff's] protected activity and an adverse employment action [was] not,

standing alone, a convincing case for proving causation." *Id.*

Here, the length of time is shorter, closer to 48 or 50 days. The defendant argues that the intervening formal complaints about the plaintiff's attitude constitute a legitimate basis for termination and, as in *Kenney*, dispel any inference of causation. The plaintiff argues that the other adverse events, including the increased scrutiny of her breaks, corroborate the inference of causation. The court has already addressed the other purportedly adverse events the plaintiff claims support causation and finds that none of them comes to the plaintiff's aid.[12] Under all of the circumstances presented here, including that the plaintiff made only a passing complaint of race discrimination and that the record as a whole lends no support to an inference of an intention on the part of WB to retaliate, the court finds that the plaintiff has failed to establish a *prima facie* case of retaliatory termination. Even assuming, however, that the passage of only seven weeks, standing alone, would be sufficient to permit an inference of causation, the plaintiff cannot show that the defendant's reason for her termination is pretextual, as discussed below.

### 2. Legitimate Reason and Absence of Pretext

The defendant asserts that the plaintiff's termination was based on her supervisors' finding that she was not a good fit for the company and that that determination was based on the facts that (1) the plaintiff was still in her probationary period when (2) WB received numerous written complaints about her attitude, both before and after her transfer to C shift, and that, (3) after the transfer, it received additional complaints, the plaintiff admittedly refused to follow her supervisor's directives, and she complained about being required to work anywhere other than the

---

[12] While "close temporal proximity coupled with evidence of heightened scrutiny may be enough to satisfy a Title VII plaintiff's burden on causation at the prima facie stage," the plaintiff offers no actual evidence, beyond her conjecture, that her job performance was unduly scrutinized. *Accord Kenney*, 965 F.3d at 449. Nor was her termination based on poor job performance.

fryer operator's station. WB has proffered a legitimate, non-retaliatory reason for the plaintiff's termination.

To establish that the proffered reason is pretext for retaliation, an employee can, "[g]enerally speaking," show that an employer's explanation for its action was pretextual in "three interrelated ways": "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (quoting *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016)). "However, the [employee] may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (quoting *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). The court must remain mindful that the plaintiff is not required, at summary judgment, to *prove* pretext; she must simply offer sufficient evidence to create a genuine factual dispute as to whether the defendant's proffered reason for the termination was pretextual. *Id.*

The plaintiff's argument in support of pretext mirrors that raised in contesting causation. She points to Wah-Abel's failure to investigate her complaints of "discrimination" and harassment, but, as discussed above, Wah-Abel had no real reason to investigate a palpably unsubstantiated complaint of race discrimination or a vague and unsubstantiated claim of "harassment." Regarding the plaintiff's refusal to work in any position other than fryer operator, Stafford claims that a White employee, Cathy, had never been cross-trained and that the defendant's supervisory employees admit that cross-training was optional rather than required. But Cathy had been employed for more than five years, had training on other stations, and was not similarly situated to the plaintiff. And

the plaintiff admits that other employees, too, were required to help out on other stations as the staffing needs of a particular day required.

Regarding the scale incident, the plaintiff does not deny that she flatly refused to follow her supervisor's directive that she use the other working scale; she simply contends that she reported the broken scale as she was supposed to do.

The plaintiff also disputes any inference that she applied "deceptively" under a different name when she applied in 2022 after quitting in 2017, pointing out that other employees go by more than one name, including Demps, who goes by both Leslie and Heather, and Steelman, who is apparently known as both Charles and Thomas. However, the defendant never asserted that the plaintiff's "deceptive" return to the company formed the basis for her termination, even if the circumstances of her first departure (when she cursed, threw her helmet at her supervisor, and quit on the spot) might have.[13]

Finally, the plaintiff objects to the subjective nature of the "largely undated" complaints against her. However, the fact that employee complaints are subjective does not mean that the employer was not objectively reasonable in relying on them. And, although they are undated, the plaintiff does not contend that they are fabricated; nor does she actually contest the facts reported in the complaints. Finally, the complaints that actually precipitated her termination were those submitted after her transfer to C shift, and those complaints are not undated.

In sum, none of the evidence to which the plaintiff points in support of her claim of pretext suggests that WB's proffered reason for the termination had no basis in fact, did not actually motivate the termination, or was insufficient to motivate the termination. *Babb*, 942 F.3d at 320

---

[13] The plaintiff apparently believed that her termination was due to this "deception." When she was terminated, she accused her supervisors of being "mad because she snuck back in." (Steelman Dep. 110, 114; Wah-Abel Dep. 154.)

Nor has Stafford offered evidence that challenges the reasonableness of the employer's decision or suggests that the proffered reason was not its actual reason. The plaintiff was a probationary employee, and WB received multiple complaints about her attitude during her probationary period. These complaints, under the circumstances, were clearly sufficient to justify her termination, and the plaintiff has not submitted sufficient evidence of pretext to give rise to a material factual dispute.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 32) will be granted in its entirety, and this case will be dismissed. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge